# WHALEN v. GREAT NORTHERN RAILWAY COMPANY.

### (137 N. W. 576.)

**Common carriers — transportation of stock — negligence — liability.**

An action founded upon alleged negligence of defendant in transporting plaintiff in charge of two cars of horses and emigrant moveables from Minneapolis to Williston. Plaintiff claims he was compelled to remain during one night in a cold stock car during a storm, and from the exposure so occasioned he contracted sickness, to his injury.

*Held*, that no liability is proven in that defendant company did not, as plead, compel plaintiff to ride in said stock car and endure such exposure, but he had ample opportunity, without risk of injury, to go to the caboose attached to the train. Plaintiff could not needlessly expose himself to the cold and recover damages occasioned thereby.

Opinion filed July 15, 1912. Rehearing denied September 25, 1912.

Note.—As to the duty of a carrier to care taker accompanying shipment of live stock, see note in 31 L.R.A.(N.S.) 632. And on the carrier's liability for personal injuries to consignor or consignee or their employees caused by unsafe car, see note in 9 L.R.A.(N.S.) 857.

Appeal by defendant from a judgment of the District Court for Towner County, *Cowan, J.,* in plaintiff's favor in an action brought to recover damages for personal injuries alleged to have been caused by defendant's negligence.

Reversed.

*Frederic T. Cuthbert, L. H. Sennett* and *A. R. Smythe* for respondent.

Respondent involuntarily and of necessity became a passenger in the car in which he was entrapped by the negligent operation and management of the appellant railway company's cars and trains. Lake Shore & M. S. R. Co. v. Teeters, 166 Ind. 335, 5 L.R.A.(N.S.) 425, 77 N. E. 599; Ohio & M. R. Co. v. Selby, 47 Ind. 471, 17 Am. Rep. 719; Blatcher v. Philadelphia, B. & W. R. Co. 31 App. D. C. 385, 16 L.R.A. (N.S.) 991.

A passenger is not negligent in not riding in the passenger coach or caboose. Norvell v. Kanawha & M. R. Co. 67 W. Va. 467, 29 L.R.A. (N.S.) 325, 68 S. E. 288; Graham v. McNeill, 20 Wash. 466, 43 L.R.A. 300, 72 Am. St. Rep. 121, 55 Pac. 631; Benedict v. Minneapolis & St. L. R. Co. 86 Minn. 224, 57 L.R.A. 639, 91 Am. St. Rep. 345, 90 N. W. 360; Lake Shore & M. S. R. Co. v. Teeters, 66 Ind. 335, 5 L.R.A.(N.S.) 425, 77 N. E. 599.

*Murphy & Duggan,* of Grand Forks, for defendant.

Goss, J. This is an appeal from a judgment entered on a verdict for $500 against defendant for alleged negligence, resulting in plaintiff's sickness from exposure endured while *en route* on a freight train from Minneapolis to Williston, such exposure occurring between Minneapolis and Wilmar, Minnesota.

The complaint recites a relationship of carrier and passenger existing between defendant and plaintiff, arising from defendant's contract to transport two cars of horses and emigrant moveables, and a negligent performance thereof to plaintiff's injury. The negligence is charged to have consisted in starting, without notice to plaintiff the freight car in which he was working at arranging its contents for the trip, and without affording him opportunity to leave it and get to a place of comfort, and because of it being kept continuously moving he

was compelled to remain within the cold and unlighted stock car from Minneapolis to Wilmar, during an entire cold and stormy night, resulting in plaintiff, because thereof, contracting a sickness to his damage in the sum of $2,000.

Many assignments of error are urged for reversal of judgment, among them being one based on the denial of defendant's motion for a directed verdict, made at the close of the testimony testing the sufficiency of the evidence to warrant the submission to the jury of any question of negligence.

The first question then is whether, under the testimony, the verdict founded on defendant's negligence as a cause of action can be sustained. We give the following *résumé* of the testimony bearing on negligence. We assume the testimony is sufficient to raise a question of fact on negligence in defendant's starting plaintiff's car on the trip without previous warning, with him inside of it arranging its contents, and without previous opportunity afforded him to get to a caboose if one was attached to the train.

Plaintiff testifies:

I didn't notice how many cars there were in the train. There were more than fifteen or twenty cars between ours and the caboose. We noticed them making up the train while we were engaged in loading our cars. They made the train up as far as I know out of cars at the freight platform. The cars at the platform had not been moved while we were loading, until the train started.

Q. Now, the train never stopped until it got out of Minneapolis some distance?

A. No, it didn't. They hitched on to our cars, and a few more were added, and then run out to the end of the switch and backed in, and then started. I don't know of these cars of ours having been pulled down to Clearwater junction and left there until the other train came from Como and picked them up. That may be so, but not that I know of. They pulled us out.

Q. They pulled you out and left you standing in the yard until the other train came along?

A. It didn't look like the yard to me.

23 N. D.—39.

Q. After your cars started to pull away from that depot platform, didn't they stop up in the yard for a while until this other train came along and picked them up?

A. The only stop I remember is somewhere they stopped long enough to couple on the main train. We were pulled away from the depot some where around 10 o'clock. I don't remember any station or stop that night outside of Minneapolis. We reached Wilmar somewhere around 5 o'clock. We didn't see any man connected with the railroad to talk to after the cars started from the depot the first time. At places where the train stopped I made no effort to get out or to see the train crew or anybody. We were in charge of those horses, taking care of them. We knew we had a right to ride on that train, in the caboose or anywhere else. I understood this from the contract. I didn't have the time with me. I had a watch, but it was not running. I don't believe Gorman had a watch. I have no recollection of stopping. I don't know where we did stop until we got to Wilmar. When I looked out of the door I saw no lights.

Q. Were there lights in the Minneapolis yards there?

A. I don't remember seeing any lights there when we stopped.

Q. You didn't see any lights there at all when you stopped—is that what you said?

A. Yes.

Q. Then you did stop there up in the yards a short ways from the depot?

A. I don't know how far it was.

Q. How long did you remain there when you stopped?

A. We remained there long enough, while the train was made up there.

Q. Then your cars were put in the train there?

A. Yes.

Q. And your two cars were left alone standing on the track there for a while, is that a fact?

A. Yes.

Q. And there was a lot of switching done, was there, in making up this full train, is that right?

A. I guess there was; I didn't pay any attention to it.

Q. You knew that the engines were working around through the

yards, and they were coupling the train up, making up the train into which your two cars were put—you knew that to be a fact, didn't you?

A. Yes, I knew that to be a fact.

Q. And after that work had been done and the train completed, it pulled out, you remember that?

A. Yes. We were loading while they were making up the train. This was not after we pulled down from the depot, the train was made up on the main siding or track right out from the depot. I guess it would be west of the depot, a matter of three quarters of a mile or so.

Q. I can't just quite understand the position that you intend to take, because, as I understand it, there is a little conflict; is it not a fact that your cars pulled out there a short ways in the yards where they stood for while?

A. The only place where I remember of that is I remember in the yards where they came in with the engine and hooked on to us and pulled up to end of the switch and put us in the main train, and left.

Q. Some time elapsed after they pulled you out to the end of the switch before you were put in the train?

A. No.

Q. And you mean to say that when you were started away from the loading platform at the depot and pulled out to the end of the main switch, you were immediately put in the train, and left town?

A. That is my answer, yes. I can't say how far out I was pulled because it was dark. They pulled us out of the Minneapolis yards. This switch that I refer to was not in the Minneapolis yards. The switch was probably a mile away from the depot. Our cars stopped long enough to reswitch back. They took the engine off of our cars, and put it on those other cars there, and put both together and pulled out.

Q. What were you doing while your two cars were standing there in the yard?

A. In the car.

Q. Why didn't you get out and go to the caboose?

A. I didn't want to get out there with the trains pulling around.

Q. What is that?

A. There were trains pulling around there. I really didn't know where it was. I knew there was a caboose on the rear of that train that

was going to pick us up. I didn't know which way to look for it. I didn't know whether we were on our own train or out in the yards. I didn't see men working in the yards, but saw the cars and the engines moving. I didn't know whether there were any men there or not. Neither Gorman nor I got out to make inquiries at that time, but simply remained in our car until it was coupled on, and went on out in the train. We remained in the car during every time the train stopped between there and Wilmar without getting out. We saw nobody. I knew where Howard Lake is, about 40 or 50 miles this side of Minneapolis. I don't know whether the train stopped at Howard Lake, Litchfield, or Delano. The train stopped a few times. It might have stopped over a half dozen times. It didn't stop a considerable length of time at those points. I didn't have any time. I was not sleeping on reaching Wilmar, and mean to say that after we pulled into Wilmar yards I immediately got out of this car and ran to the caboose, and just succeeded in reaching it when the train pulled out of Wilmar. I can't say whether the train remained at Wilmar thirty minutes or not. At the time they coupled on to the cars I didn't know they were going to pull out of the yards. This was probably a mile from the depot, or may be more. I looked out and couldn't see anything only box cars along there.

Q. Did you know they were going to pull you out then, or take you back?

A. I knew nothing about it. Figured they would run up back into the yard and up closer to the depot somewhere.

Q. And you figured that you would then go back to the caboose?

A. Yes. We were still within the city limits of Minneapolis when we pulled out of there a mile. I saw the green switch lights, but saw no city or electric lights. This was about 10 o'clock in the evening. There were box cars along on both sides, and we were in this car, and the only way I could see lights would be in the sky; the box cars obstructed the view. I could have gotten out of the car. There was not anything to interfere with that. There wasn't anyone told me that the train would pull back to the depot. I made no inquiries about that. I was in Minneapolis all of the 17th of March, and had lots of time to inquire and find out when this train left and when it arrived there. The man that showed us the cars said the train was due to pull out some-

where after 8, but it was late. He didn't say where it would pull from, and we asked nobody about it. Whenever the train stopped after it left Minneapolis until it got to Wilmar was looking out for an opportunity to get out and make the caboose. When these two cars of ours were being put in the train at the junction, there may have been cars put on both ends of them by cars being switched on to the head end and again on to the rear. We could not see the caboose at any of the points where the stops were made. We were probably eight or ten cars from the engine. I should judge this when I could see the train at Wilmar. We could see the sparks from the engine once in a while a short distance ahead. We made no effort to get out and go to the engine during any of these stops. I was looking for the caboose. I knew there were train men on the engine. We had no way of knowing how long the train would stop when it made the different stops.

Plaintiff further testifies in substance that the night was dark, their whereabouts strange and unknown to them. They were without light; were afraid to jump out of the car, not knowing but what to do so would be to injure themselves. At no stop were there lights so they could see a way to safety, nor see where they were, or see the caboose. It was storming and very cold.

His companion, Gorman, testified substantially the same, and "that the train made some stops once or twice. I saw nothing but storm. I did not get out of the door, because I didn't want to take chances on being frozen to death or lost. At Wilmar we got out and went to the caboose. My watch was not running. I didn't know what time we got into Wilmar. I don't know whether the cars were pulled out about a mile, as claimed by Whalen, or not. I don't remember. I don't think the train remained in the yards until 3 o'clock in the morning. I can't swear to it. They was moving around all the time, and going. I suppose, they was going right along. I can't tell whether they backed up or not, and would not swear that they were going forward all the time. They were doing some bumping. During the two hours that we were working there, loading after 8 o'clock, we did not ask anybody what train would take us out, when it would take us out, or where it would go. It took some time to tie the horses and nail up planks after we got started."

Q. It may have stood as long as an hour and fifty minutes in the

yards there, so that your cars may have stood while they were being put into the train, or may have stopped as high as an hour and twenty minutes out at some station on the road, as far as you knew?

A. I don't think, but it might have.

Q. If the records of the train made at the time by the conductor should show that, I will ask you whether or not you are in a position to dispute, whether you would dispute it or not?

A. I wouldn't swear to it.

Q. It may be so?

A. It may be. I made no effort to get out of the cars while we were in the yards, or find anybody and make inquiries about anything. Whalen did not get out of the car either. We talked together and wondered where they were going to stop so we could get off.

Q. And did it not occur to either one of you to get out of the car and go and make inquiries of somebody you might be able to find?

A. We supposed someone would come and tell us. We expected somebody to notify us that we were pulling out. After pulling away from the platform I don't know where they stopped, can't say. The train master said to us at the time, "Look out boys, the train is pulling out." I understood they were going to leave town. If they did stop in the yards, it was dark and stormy, and we saw no persons there. We did not know what part of the city we were in. We didn't know how long the train would stop at any of the places where stops were made. No one told us where the caboose was. Nothing was said to us with reference to finding the caboose. This was a very long train. I should judge there were forty or fifty cars in it on reaching Wilmar. We were nearer the engine than the caboose. I had no opportunity to get out of the car from the time we were pulled away from the platform at Minneapolis until arrival at Wilmar. I was looking for such an opportunity. Witness Gorman testified he has an action pending against the defendant, arising out of the same transaction, for "exposure."

The testimony of the defense was to the effect that Whalen was told at 6:30 that night that the cars would be pulled away from the platform between 7 and 8, and taken to Clearwater junction, where the regular freight would pick them up about midnight; that they would

have to stay in the cars and ride to the junction with their stuff, though this is denied by plaintiff; that the caboose would be at Clearwater junction, about three quarters of a mile from where their cars were loaded, also denied by plaintiff. The conductor's written train records, received in evidence, show that the freight train left Como one minute past midnight, or at 12 : 01 in the morning of March 18th, arriving at Wilmar at 9 : 15 the following morning, instead of at 5 o'clock, as plaintiff testified. The time tables for this freight train over that division scheduled it to leave Como at 12 : 01 A. M., to arrive at Clearwater junction at 1 : 05 A. M., and to depart therefrom at 2 : 35 A. M. Conductor's testimony is that the train was run according to this time schedule. The conductor's written delay report in evidence shows the following stops, after leaving Clearwater junction, at which place the two stock cars in question were placed in the train; namely, at Delano, 10 minutes for taking water; at Howard Lake, 42 miles from Minneapolis, one hour and ten minutes delay in meeting trains Nos. 4 and 10; at Smith Lake, five minutes taking coal and ten minutes delay taking water; at Litchfield, twenty minutes delay for train No. 22, and at Atwater, ten minutes delay for train No. 52, with arrival at Wilmar at 9 : 15 A. M., one half hour later than time schedule.

Will the foregoing testimony support the verdict, and sustain the jury's finding that the defendant company was guilty of negligence, and that such negligence was the proximate cause of plaintiff's injury? After a most careful consideration of all the testimony, we have arrived at the conclusion that it is not proven that any act of defendant or its servants was the proximate cause of plaintiff's injuries from exposure. Granting that plaintiff's version is correct, as to an enforced and hasty departure immediately after loading, and while they were arranging the stock and goods in the second car, from this simple fact alone no injury to plaintiff is proven to have followed as the proximate result thereof. To constitute a cause of action, plaintiff must also prove, as he has plead, that besides such negligent act in starting plaintiff on the trip without warning or opportunity to get to the caboose or notify him of its whereabouts, that he was thereafter compelled to so remain against his will, subject to exposure, by circumstances thereafter intervening, or that he was so placed as to compel him to elect between staying subject to exposure, or invite danger, real or apparent, to his person.

in extricating himself therefrom. Gorman testifies that, for sometime after their cars were moving, they were busy tying the horses and arranging things within the car, and "while the switching was going" depended upon someone "to come and tell us" where the caboose was. It is equally conclusive from plaintiff's cross-examination that soon after pulling out from the loading platform they stopped for a considerable time during which the train was made up, or their car incorporated in another train. Conceding that the loading platform was left at about 10 o'clock, as plaintiff and Gorman testify, they must have remained for between four and five hours at Clearwater junction, three quarters of a mile from their starting point, during which time ample opportunity must have been afforded plaintiff and his companion to determine whether they wanted to stay in the stock car, or find a place more comfortable, and to go there. It appears, also, that more than reasonable opportunity was afforded them to go to the caboose during the run from the junction to Wilmar. If they had doubts about reaching the caboose, they could easily have reached the engine, five to ten cars ahead, and either gotten aboard or notified the trainmen of their predicament. They do not claim that they did anything to better their condition. They were grown men, not children, and the defendant was warranted in dealing with them on the supposition that they possessed average intelligence and were using it *en route*. It was their duty to use reasonable and ordinary diligence and care to protect themselves from exposure, or be held to suffer the consequences. That they chose the latter alternative is their own, and not the company's negligence. They were not compelled, as they assert in their complaint, to remain in the stock car. They have failed on this part of their case to raise any question of fact for the jury. Besides, they had the right to remain where they did and care for their stock. Plaintiff states that such was his right under the contract. And the company's agents were not negligent if they assumed plaintiff elected so to do, instead of riding in the caboose. The company was not to blame for the inclement weather, nor for the voluntary election of plaintiff to expose himself to the elements, instead of doing the contrary. Unless the act of the defendant's agents or employees in charge of the train prevented plaintiff from going to the caboose or place of shelter afforded, the defendant would not be liable, and we cannot see that any serious

obstacles intervened to prevent plaintiff from having, with reasonable diligence, extricated himself from this predicament, without danger, real or apparent.

If authority for our conclusions is necessary, we cite 1 Cooley on Torts, 3d ed. 99,—under proximate cause,—and 3d subd. page 101, reading: "If the original act was wrongful and would naturally, according to the ordinary course of events, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause passing by those which were innocent. But if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another the injury shall be imputed to the last wrong as the proximate cause and not to that which was more remote." See also same authority, page 123, from which we quote: "But if the acts or neglect were not concurrent in time, and the party last in fault was chargeable with some duty to the other, which if performed would have prevented the injury, the law will attribute to his culpable conduct the injurious consequence, and refuse to look beyond it. For illustration, the case may be instanced of the escape of gas into a dwelling in consequence of the negligence of the gas company, and the subsequent ignition of the gas through the negligence of a tenant. 'If the tenant, upon discovering the presence of gas in large quantity in the house, neglected to give notice to the agents or servants of the defendant, or to take reasonable precautions to remove or exclude the gas, and recklessly brought the flame of a candle in contact with it, thus bringing about injurious effects, which would not have followed but for such reckless or negligent conduct on his part, the defendant ought not to be held responsible for those results. Whatever of care was requisite for the protection of the premises under the circumstances was due from the occupant. The defendant, as well as the plaintiff, had a right to expect and require it of him. . . . If the intervening misconduct of the occupant produced the explosion which was the immediate cause of the injury to the building, the plaintiff cannot charge the legal responsibility for that result upon the original negligent act or omission of the defendant.' " Granting, then, that the company was negligent in the first instance, in hauling defendant's car, with him in it, away from the loading platform without notice to him, and that the

results of such negligence continued as a direct cause of plaintiff's exposure until the time came for plaintiff to extricate himself from his exposed situation, and prevent injury to his person by exposure to the elements, such direct and formerly proximate cause immediately became the remote cause or act of negligence when plaintiff failed to avail himself of any reasonable opportunity to avoid exposure. Realizing this to be the law applicable, and that would arise under the facts, counsel for plaintiff have specifically plead that the exposure resulted from the original negligent act, kept alive as a proximate cause for the injury by force of circumstances over which defendant had no control, compelling him to remain continuously exposed until therefrom injury by the cold was occasioned, from which sickness developed. In the proof, as heretofore stated, the circumstances conclusively disprove such compulsion, and lower the original negligent act from the proximate to the remote cause of injury by exposure.

And what is true as to the assumed negligent act as above discussed is true as to alleged negligence predicated upon the stock car being out of repair, besides it has no basis under the proof. No defect, as such, is shown,—simply an inability to fully close the door from the inside. The company carried a caboose for plaintiff's comfort. As before stated, it was unnecessary for him to remain in the stock car. Granting that it was defective, and conceding that the proof establishes that the door was defective in that it could not be closed from the inside, such defect is not the proximate cause of the exposure, but, instead, said cause is plaintiff's failure to go to the caboose wherein he belonged if he would avoid exposure.

We conclude that plaintiff has wholly failed to establish a cause of action against defendant for the alleged negligence complained of, or at all. While granting due consideration for the findings of fact necessarily embraced in the verdict, we are satisfied that no facts exist from which it can be said that defendant was guilty of negligence which, as a proximate cause, resulted in plaintiff's exposure to his injury; and that the judgment of the trial court must be reversed and set aside, and this action dismissed, and it is so ordered.

It is not out of place to here remark that appellant's abstract contains an original complaint only, with answer thereto, as the purported basis for the issues upon which trial was had. The trial court's instructions

being so out of harmony therewith, we have explored the record and found an amended complaint, served and filed by stipulation of counsel, radically changing the questions of alleged negligence involved. Such amended complaint is not printed in appellant's abstract. We know this to have been an oversight, but that does not excuse the presenting to this court in this manner upon appeal false issues. There may also have been a duty resting upon respondent's counsel to call our attention thereto, which they have not done, but that does not excuse appellant. This court has a right to insist that the abstract presented by an appellant fully, fairly, and correctly reflect all the issues presented below. And it is the duty of an appellant to see that no misleading issue is presented on an appeal.